UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re PetroChina Company Ltd. Securities
Litigation

**OPINION AND ORDER**

Master File No.
13-cv-6180 (ER)

Ramos, D.J.:

This consolidated class action arises from an alleged bribery scheme at the Chinese oil

and gas company, PetroChina Company, Ltd. ("PetroChina" or "the Company") during the

period between April 26, 2012 and December 17, 2013 (the "class period").  According to the

Second Amended Class Action Complaint ("SAC"), during the class period, PetroChina falsely

claimed to have adequate internal controls, while representing that it was complying with

applicable laws and regulations and maintaining high standards of corporate governance and

ethics.  Lead Plaintiffs Jeffrey Klein and Samuel Ayoub (collectively, "Plaintiffs") filed the

instant action individually and on behalf of those who purchased PetroChina securities during the

class period.  Plaintiffs assert claims against PetroChina, and three of its officers:  (1) Jiang

Jiemin ("Jiang"), the Company's former Chairman and acting Chief Executive Officer; (2) Li

Hualin ("Li"), the Company's former Vice President and Secretary to the Board of Directors;

and (3) Ran Xinquan ("Ran"), the Company's former Director and Vice-President (collectively,

"Individual Defendants").[1]  Count One of the SAC alleges violations of § 10(b) of the Securities

---

[1] A Chinese name starts with the surname, followed by the given name.  The Court follows the naming conventions used in the SAC, which normally refers to individuals by their family names.  However, where two individuals share a surname, the SAC refers to them by their given names.

and Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 against all Defendants.  Count Two

asserts a claim under § 20(a) of the Exchange Act against the Individual Defendants.

PetroChina moves to dismiss Count One of the SAC under Rule 12(b)(6) of the Federal

Rules of Civil Procedure.[2]  For the reasons set forth below, PetroChina's motion to dismiss is

GRANTED.

## I.    Background[3]

### A.  Factual Background

*i.   The Company*

PetroChina is the largest oil and gas producer and distributor in the People's Republic of

China ("PRC").  SAC ¶ 2.  PetroChina's American Depositary Shares ("ADS") have been listed

on the New York Stock Exchange since April 6, 2000.  *Id.*  The SAC identifies China National

Petroleum Corporation ("CNPC") as PetroChina's parent company.[4]  *Id.*  Zhou Yongkang

("Yongkang") was CNPC's General Manager between 1988 and 2002.  *Id.* ¶ 21.  Before

becoming chairman of PetroChina in 2007, Jiang worked at CNPC, where he rose from working

at several subsidiaries, to becoming Vice President, and finally the Director in 1999.  *Id.*

---

[2] As of the date of this Order, the Individual Defendants have not yet been served.  Defendants indicate that, although the arguments in their motion are "largely applicable to the Individual Defendants, this motion is not made on their behalf at this time."  Defs.' Mem. L. Supp. Mot. Dismiss, Doc. 43 at 1.

[3] The following factual background is based on the allegations in the SAC, Doc. 37, which the Court accepts as true for purposes of the instant motion.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  In addition, the Court considers documents incorporated by reference, legally required public disclosure documents filed with the Securities and Exchange Commission ("SEC"), and any documents that Plaintiffs relied upon in bringing the instant action.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citing *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)).

[4] The SAC specifies that "PetroChina was established as a joint stock company with limited liabilities by . . . CNPC . . . [c]onsequently, CNPC is PetroChina's parent."  SAC ¶ 2.

ii.   *PetroChina's Alleged Misrepresentations*

The class period begins on April 26, 2012, when the Company filed its annual report ("2011 annual report") with the SEC on Form 20-F, which was signed by Li.  *Id*. ¶ 47.  The Company's 2011 annual report stated that the Chairman evaluated the effectiveness of PetroChina's disclosure controls and procedures and concluded that the Company's "disclosure controls and procedures were effective to ensure that material information required to be disclosed in the reports . . . is recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and regulations and that such information is accumulated and communicated to [the] company's management . . . as appropriate, to allow timely decisions regarding required disclosure."  *Id*.  The report also stated that the Company evaluated the effectiveness of its internal control over financial reporting and determined that its financial reporting was effective as of December 31, 2011.  *Id*.  The effectiveness of the Company's internal control was audited by PricewaterhouseCoopers.  *Id*.

The report also contained a required Sarbanes-Oxley Act of 2002 ("SOX") certification, signed by Jiang.  *Id*. ¶ 54.  As part of the SOX certification, Jiang swore that the annual report did not contain any "untrue statement of a material fact."  *Id*.  Jiang attested to the fact that he and the other certifying officer had put into place and evaluated PetroChina's disclosure controls and procedures to ensure that material information is made known and the reliability of financial reporting is assured.  *Id*.  Jiang also certified that,  based on the "most recent evaluation of internal control over financial reporting," he had disclosed to the Company's auditors two items of information:  (1)  "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information;" and

(2) "any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."  *Id*.

The 2011 annual report indicated that the Company adopted two codes of ethics, one for its senior management, and a separate one for its employees.  *Id*. ¶ 50.  The report acknowledged that the Company did not currently have a code of business conduct and ethics for directors and that its directors were required to comply with the Model Code for Securities Transactions by Directors of Listed Companies, pursuant to the Hong Kong Stock Exchange ("HKSE") Listing Rules.  *Id*.  Finally, the report stated that, under PRC Company Law and HKSE Listing Rules, the CEO of PetroChina is not required to certify to the NYSE each year that he is not aware of any violation by the company of NYSE corporate governance listing standards and therefore would not be submitting such a certification.  *Id*.

The code of ethics for employees at PetroChina, prohibited them from accepting "any valuable gratuity that may affect their decision-making and disturb their independent judgment, or allow their relatives or any third party to accept this kind of gratuity."  *Id*. ¶ 51.  Similarly, PetroChina's code of ethics for senior management prohibited the acceptance of gifts "of a value that may tend to influence business decisions or compromise independent judgment" by senior management, along with their close family members.  *Id*.  Employees and senior management alike were required by the code of ethics to comply with local laws and regulations.  *Id*.  Meanwhile, the Company's website separately stated that PetroChina has "always and conscientiously complied with the requirements of the China Securities Regulatory Commission, the Stock Exchange of Hong Kong . . . the New York Stock Exchange, Inc. and the United States Securities and Exchange Commission as well as other regulatory requirements[.]"  *Id*. ¶ 52.  The website also stated that the Company "has been regulating its internal management and

operations in a strict manner" and "provided all the market participants and regulatory authorities with timely, accurate, complete and reliable information of the Company, striving to enhance the company value." *Id*.

On April 26, 2013, the Company filed a second annual report with the SEC on Form 20-F ("2012 annual report"), which contained the same language about the Company's internal controls and compliance. *Id.* ¶ 55. Once again, Li certified the 2012 annual report. *See* Paskowitz Decl., Doc. 44, Ex. A at 10.[5] However, Zhou Jiping ("Jiping")—who was performing the functions of the CEO and is identified in the SAC as PetroChina's Chairman—signed the accompanying SOX certification. *Id.* at 13; *see also* SAC ¶ 46.

   iii.   *The Corruption Investigation*

Under the leadership of the PRC's current president, the government began "cracking down" on corruption in state-owned enterprises, such as PetroChina.[6] SAC ¶ 19. On March 18, 2013, Jiang resigned from PetroChina and began working as Director of the State-owned Assets Supervision and Administration Commission ("SASAC"). *Id.* ¶ 22. Chinese news outlets reported that Jiang was "promoted" to SASAC director so that PRC authorities could conduct their corruption investigation of PetroChina officials "without interference from Jiang." *Id.* According to the SAC, Jiang was Yongkang's "protégé." *Id.* ¶ 20. Yongkang has been under house arrest by the PRC since 2013, after the government seized over $14.5 billion of his assets in connection with a corruption investigation.[7] *Id*.

---

[5] Given that many of the documents attached to Paskowitz's declaration do not contain consecutive page numbers, the Court will refer to the page numbers as they appear on ECF.

[6] The SAC does not state when the PRC began investigating PetroChina or PetroChina officials; however, in their papers, Plaintiffs indicate that the PRC began investigating state-owned enterprises in the country "[b]eginning in and around 2013." Pls.' Mem. L. Opp., Doc. 47 at 5.

[7] The SAC does not indicate when Yongkang was placed under house arrest or when his assets were seized.

The SAC claims that the corruption at PetroChina consisted of "bribery, political corruption, and undisclosed related party transactions." *Id*. ¶ 23.  On August 26, 2013, the PRC Ministry of Supervision Company announced that CNPC Vice President Wang Yongchun was also under investigation for "gross violation [sic] of party discipline." *Id*. ¶ 26.  On August 27, 2013, PetroChina announced that SASAC had launched an investigation Li, Ran, and PetroChina chief geologist Wang Daofu for "severe breaches of discipline."[8] *Id*. ¶ 27.  PetroChina's announcement further stated that all three officials had resigned from the Company.  *Id*.

In early September 2013, the PRC news media reported that one of PetroChina's suppliers, Wison Engineering Services, was under investigation for corruption.  *Id*. ¶ 29.  The investigation resulted in the PRC freezing the supplier's bank accounts, the CFO stepping down, and the Chairman and controlling shareholder being arrested.  *Id*. ¶ 30.  During this time, the media also reported that a second PetroChina supplier, Mingxing Cable ("Mingxing"), was also under investigation in connection with the Company.  *Id*. ¶ 31.  Several of Mingxing's senior officials "disappeared from the public" and its Vice President "coincidentally" passed away.  *Id*. The following month, on October 18, 2013, a PRC news outlet quoted a source at PetroChina who claimed that the Company was involved in a corrupt bidding program at an Indonesian oilfield, wherein PetroChina bribed another company $800 million in order to expand its business in the region.[9] *Id*. ¶ 24.  Finally, on December 17, 2013, Bloomberg LP reported that

---

[8] Plaintiffs maintain that "severe breaches of discipline" is the equivalent of corruption.  SAC ¶ 27.  PetroChina correctly notes that, contrary to Plaintiffs' allegations, the Company's announcement did *not* mention "severe breaches of discipline."  *See* Paskowitz Decl., Doc. 44, Ex. C; *see also* Doc.  43 at 5 n.3.

[9] The SAC does not specify who in PetroChina allegedly offered the bribe, or when it was offered.

PRC authorities had taken Wen Qingshan ("Qingshan"), a PetroChina Supervisor, into custody in connection with its corruption investigation of PetroChina.[10] *Id.* ¶ 33.

On April 14, 2014, several months after the class period ended, PRC authorities detained Yan Cunzhang, a PetroChina General Manager, in connection with the corruption investigation of the Company. *Id.* ¶ 36. On May 16, 2014, the news media reported that Bo Qiliang, PetroChina's Overseas Operations Chief, was under official investigation. *Id.* ¶ 37. On June 20, 2014, the Shaanxi Chinese People's Political Consultive Conference revoked Ran's membership "for serious violation [sic] and criminal conduct," an action which Plaintiffs maintain only happens in cases of serious misconduct. *Id.* ¶ 38. The Supreme People's Procuratorate filed criminal bribery charges against Jiang on July 14, 2014; Jiang was later expelled from the Communist Party on October 23, 2013. *Id.* ¶ 40. On July 16, 2014, a Canadian news outlet reported that Li Zhiming ("Zhiming"), a PetroChina executive in charge of the Company's Canadian operations, had been arrested by the Chinese government for corruption. *Id.* ¶ 42. At the end of the month, on July 29, 2014, the Canadian news media reported that PetroChina's chief business representative in Canada recently resigned from the Company and had been missing ever since. *Id.* ¶ 43. Meanwhile, the General Manager of PetroChina's Indonesia operations, along with the General Manager of Iran operations, were arrested for corruption. *Id.* Finally, on October, 10, 2014, a Chinese news outlet reported that Wang Lixin ("Lixin"), the Chairman of PetroChina's supervising committee, was detained by government officials in connection with the corruption investigation. *Id.* ¶ 44.

---

[10] The SAC also alleges that Wang Lihua, the "head" of an entity called Chinaoil, was taken into custody as well. SAC ¶ 33.

**B.  Procedural Background**

On September 3, 2013, Johan Broux, individually and on behalf of purchasers of PetroChina securities between April 26, 2012 and August 27, 2013, filed a Complaint against PetroChina, Jiang, and three other PetroChina officials.  *See* Doc. 1.  On September 6, 2013, Sandy Hsu, individually and on behalf of purchasers of PetroChina securities between April 26, 2012 and August 27, 2013, filed a Complaint against PetroChina alone.  *See Hsu v. PetroChina Company Ltd.*, No. 13-cv-06274, Doc. 1.  Both actions accused the defendants of violating § 10(b) of the Exchange Act, Rule 10b-5.  *See id*., *see also* Doc 1.  On November 11, 2013, Jeffrey Klein and Samuel Ayoub filed a motion to consolidate the two cases, appoint the two of them as Lead Plaintiffs, and approve their selection of the Rosen Law Firm, P.A. as Lead Counsel.  Doc. 3.  The Court granted Plaintiffs' motion on April 4, 2014.  Doc. 16.

Plaintiffs filed a consolidated Amended Complaint on June 6, 2014 against PetroChina, Jiang, Li, and Ran.  Doc. 17.  The Amended Complaint alleged violations of § 10(b) of the Exchange Act and Rule 10b-5 against all Defendants, along with asserting a claim under § 20(a) against the Individual Defendants.  *See id*.  On August 6, 2014, PetroChina filed a motion to dismiss the Amended Complaint.  Doc. 26.  On September 29, 2014, Plaintiffs submitted a letter to the Court requesting a pre-motion conference in connection with their intent to seek leave to file another amended complaint, in light of new facts which had arisen concerning the arrests of additional PetroChina officials.  *See* Doc. 31.  At the October 23, 2014 conference, the Court granted Plaintiffs leave to file the SAC, on the condition that any dismissal under Rule 12(b)(6) would be with prejudice.  *See* Hr'g Tr., Oct. 23, 2014, Doc. 34 at 10:1-3, 11-17.

Plaintiffs filed the SAC on November 14, 2014.  Doc. 37.  On February 13, 2015, PetroChina filed its motion to dismiss the § 10(b) and Rule 10b-5 claims.  Doc. 42.

## II.    Plaintiffs' Claims

Plaintiffs take issue with the annual report, PetroChina's codes of ethics, certain

representations made on PetroChina's website, and Jiang's SOX certification, arguing that

Defendants failed to disclose the following:

> (1) the Company's internal controls were inadequate; (2) contrary to
> Defendants' public statements, the Company's senior officials were
> in non-compliance with the applicable laws and regulations and the
> Company's corporate governance directives and code of ethics;
> (3) as a result, the Company was subject to investigation and
> disciplinary action by various governmental and regulatory
> authorities; (4) the Company's financial statements were materially
> false and misleading as they contained direct references to the
> Company's Code of Ethics and statements regarding its compliance
> with applicable laws, regulations and internal governance policies;
> (6) that the SOX certifications signed by PetroChina's senior
> management was materially false and misleading as senior
> management was aware of "any fraud, whether or not material" and
> of significant or material internal control weaknesses; and (7), as a
> result of the foregoing, the Company's financial statements were
> materially false and misleading at all relevant times.

SAC ¶ 56.

Plaintiffs claim that, as a result of PetroChina's August 27, 2013 announcement that

several PetroChina's officials were resigning in connection with SASAC's investigation, trading

in PetroChina shares halted that day.  *Id*. ¶ 27.  When trading resumed on August 28, 2013,

PetroChina shares declined $3.93 per share, closing at $107.82 per share.  *Id*. ¶ 28.  Plaintiffs

claim that "[n]early $950 million in market capitalization was wiped out[.]"  *Id*.  Plaintiffs

further allege that  the investigations into PetroChina's suppliers, together with the arrest of

PetroChina Supervisor Qingshan, caused PetroChina's stock to fall from $109.43 per share to

$106.99 per share on December 17, 2013, a nearly $600 million market capitalization decline.[11]
*Id*. ¶ 34.

Plaintiffs also point to a Bloomberg LP report from September 3, 2013, stating that
Templeton Asset Management Ltd. ("Templeton") announced that it cut its stake in PetroChina
from 5.34 percent to 4.42 percent. *Id*. ¶ 46. The article quoted a representative from Central
China Securities Holdings Co., stating that "[i]nvestors are avoiding risks because this company
had more problems recently, especially with the higher management." *Id*. On a March 20, 2014
conference call, PetroChina's Chairman Jiping stated that the "anti-graft investigation of some of
our top management incurred great shakes in the market. This was an unprecedented severe
challenge for us." *Id*. ¶ 46.

## III.   Legal Standard

### A.  Rule 12(b)(6) Motions to Dismiss:  General Legal Standard

When ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6),
the court must accept all factual allegations in the complaint as true and draw all reasonable
inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). The court is
not required to credit "mere conclusory statements" or "threadbare recitals of the elements of a
cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*,
550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551). "To survive a
motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief

---

[11] The SAC does not state the date on which PetroChina shares were valued at $109.43. However, Bloomberg
finance historical data, which PetroChina attached to its motion to dismiss, shows that the closing share price for the
ADS of PetroChina dropped from $111.76 on December 16, 2013 to $109.27 on December 17, 2013. *See* Paskowitz
Decl., Doc. 44, Ex. D at 2. In its papers, PetroChina notes that Plaintiffs mistakenly quoted adjusted prices; as
opposed to the actual closing share price. *See* Doc. 43 at 6 n.6.

that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.*  If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 680.

The question in a Rule 12 motion to dismiss "'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 278 (2d Cir. 1995)).  "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits,'" and without regard for the weight of the evidence that might be offered in support of Plaintiffs' claims. *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quoting *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)).

**B.  Heightened Pleading Standard under Rule 9(b) and the PSLRA**

Beyond the requirements of Rule 12(b)(6), a complaint alleging securities fraud must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") by stating the circumstances constituting fraud with particularity.  *See, e.g.*, *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319-20 (2007)).  Specifically, Rule 9(b) requires that

11

a securities fraud claim based on misstatements must identify:  (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent.  *See, e.g.*, *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012) (citing *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).  Like Rule 9(b), the PSLRA requires that securities fraud complaints "'specify' each misleading statement," set forth the reasons or factual basis for the plaintiff's belief that the statement is misleading, and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u–4(b)(1), (2)); *see also, e.g.*, *Slayton v. Am. Express, Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

## C.  External Documents

The Court may consider a document that is attached to the complaint, incorporated by reference or integral to the complaint, provided there is no dispute regarding its authenticity, accuracy or relevance.  *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir. 2010) (internal citations omitted).  "To be incorporated by reference, the [c]omplaint must make a clear, definite and substantial reference to the documents."  *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 691 (S.D.N.Y. 2011) (internal quotation marks and citation omitted).  The SAC cites and primarily relies on PetroChina's 2011 and 2012 annual reports, thereby incorporating them by reference.  Thus, the Court will consider them in deciding the present motion.[12]  The SAC also cites PetroChina's August 27, 2013 announcement that Li and Ran were under investigation and resigning, which is therefore incorporated by reference.  *See*

---

[12] PetroChina attached portions of the reports to its motion to dismiss.  *See* Paskowitz Decl, Doc. 44, Exs. A-B. Plaintiffs also attached PetroChina's 2011 annual report to their papers.  *See* Kim Decl., Doc. 48, Ex. 5.

Paskowitz Reply Decl., Doc. 51, Ex. 5; *see also* SAC ¶ 26.  Defendants additionally attached

Bloomberg finance historical data containing the daily closing share price for the ADS of

PetroChina during the class period.[13]  *See id.* at Ex. D.  Since the SAC references this data, *see*

SAC ¶ 28, it is also incorporated by reference.  For their part, Plaintiffs also submitted several

documents, in addition to their opposition brief, for the Court's consideration.  *See* Kim Decl.,

Doc. 48.  The Court will consider PetroChina's announcement of Jiang's resignation and the

copy of the December 17, 2013 Bloomberg article, both of which are cited by the SAC.[14]  *See id.*

at Exs. 6, 9; *see also* SAC ¶¶ 22, 33.

## IV.    Discussion

Section 10(b) of the Exchange Act prohibits using or employing, "in connection with the

purchase or sale of any security . . . any manipulative or deceptive device or contrivance," 15

U.S.C. § 78j(b), while SEC Rule 10b–5, promulgated thereunder, creates liability for a person

who makes "any untrue statement of a material fact or . . . omit[s] to state a material fact . . . in

connection with the purchase or sale of any security."  *In re OSG Sec. Litig.*, 971 F. Supp. 2d

387, 397 (S.D.N.Y. 2013) (quoting 17 C.F.R. § 240.10b-5 (1951)).

To state a private civil claim under Section 10(b) and Rule 10b-5, a plaintiff must plead

that:  (1) the defendant made a material misrepresentation or omission, (2) with scienter, *i.e.*, a

---

[13] Plaintiffs attached a printout of Yahoo! Finance's documentation of historical prices for PetroChina stock between March 17, 2013 and March 20, 2013.  *See* Kim Decl., Doc. 48, Ex. 11.

[14] Plaintiffs also provided various other documents that the Court may not consider on a motion to dismiss, including news articles published in 2015 and two academic articles.  *See* Kim Decl., Exs. 1-4, 7-8, 12.  The SAC neither references nor relies on these documents; therefore they are not incorporated by reference or subject to judicial notice.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("[A] plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." (emphasis in original)).

wrongful state of mind, (3) in connection with the purchase or sale of a security, and (4) that the plaintiff relied on the misrepresentation or omission, thereby (5) causing economic loss. *Dura*, 544 U.S. at 341-42; *see also, e.g.*, *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 153 (2d Cir. 2007); *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001). PetroChina argues that Plaintiffs have not plead facts that raise a strong inference of scienter, and fail to plead an actionable misstatement or omission. Defs.' Mem. L. Supp. Mot. Dismiss, Doc. 43 at 2. PetroChina also maintains that Plaintiffs have not plead loss causation. *Id.* at 2-3.

**A. Section 10(b): Material Misstatements and Omissions**

In order to survive a motion to dismiss, Plaintiffs must establish that Defendants "made a statement that was '*misleading* as to a *material* fact.'"[15] *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)) (emphasis in original). "A violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an alleged material misstatement was false *at the time it was made*." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (emphasis in original) (citing *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 812-13 (2d Cir. 1996)). Furthermore, the Second Circuit has repeatedly indicated that plaintiffs cannot simply assert that a statement is false— "they must demonstrate with specificity why . . . that is so." *Rombach*, 355 F.3d at 174.

---

[15] In determining materiality, the question is whether "there is 'a substantial likelihood that the disclosure of the [omitted fact] would have been viewed by the *reasonable* investor as having *significantly* altered the total mix of information [ ] available.'" *Monroe Cnty. Employees' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 349 (S.D.N.Y. 2014) (quoting *In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013)) (alterations and emphasis in original). PetroChina argues that, even if its public statements were misleading, they did not constitute *material* misstatements or omissions. Defs.' Reply Mem. L. Supp. Mot. Dismiss, Doc. 50 at 6. However, since the Court finds that PetroChina did not make a misrepresentation or omission, it need not address the issue of materiality.

With respect to material omissions, a defendant's silence is not misleading absent a duty to disclose. *Basic*, 485 U.S. at 239 n.17. "Disclosure of an item of information is not required, however, simply because it may be relevant or of interest to a reasonable investor." *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002). Rather, "[a] duty to disclose arises whenever secret information renders prior public statements materially misleading, not merely when that information completely negates the public statements." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993). The parties are not under a duty to disclose information that is equally available, widely reported, or "so basic that any investor could be expected to know it." *Monroe Cnty. Employees' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 349 (S.D.N.Y. 2014) (internal citations omitted).

Here, the primary source of the purported misrepresentations is the 2011 annual report, filed on April 26, 2012. *See* SAC ¶¶ 47-54, 56; *see also* Paskowitz Decl., Ex. B, Doc. 44. PetroChina's 2011 annual report was signed by Li, and included the required SOX certification, signed by Jiang. *Id.* ¶¶ 47, 54. The annual report also referenced two codes of ethics, which were posted on PetroChina's website. *Id.* ¶ 50. The SAC alleges that, on April 26, 2013, PetroChina filed its 2012 annual report, which "repeated the same misstatements about the effectiveness of the Company's internal controls and compliance with corporate governance matters and laws and regulations." *Id.* ¶ 55. The Court notes that, although the SAC states that PetroChina's 2012 annual report was essentially identical to the prior year, Jiping, rather than Jiang, signed the 2012 SOX certification. *See* Paskowitz Decl., Doc. 44, Ex. A. at 13.

As an initial matter, rather than precisely identifying the statements that Plaintiffs purport to have been falsely made, the SAC simply contains large block quotations taken directly from PetroChina's annual reports, codes of ethics, and website. *See* SAC ¶¶ 49-54. Most of these

block quotes are several paragraphs long and are preceded by a conclusory assertion that they were falsely made. *See id.* The Second Circuit has commented that district courts should not have to "search the long quotations in the complaint for particular false statements, and then determine on its own initiative how and why the statements were false and how other facts might show a strong inference of scienter." *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012).

In their papers, Plaintiffs identify three false statements by PetroChina. Pls.' Mem. L. Opp., Doc. 47 at 10-14. First, they point to Jiang's SOX certification, attached to the 2011 annual report, which states that he disclosed "any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting" to the Company's auditors and board of directors. *See id.* at 10-11; *see also* SAC ¶ 54. Second, Plaintiffs identify Jiang's statement in the SOX certification that he had disclosed significant internal control deficiencies to PetroChina's auditor. *Id.* Finally, Plaintiffs claim that PetroChina falsely stated that its internal controls were adequate, presumably in both its 2011 and 2012 annual reports. *Id.* The SAC also alleges that PetroChina falsely claimed that it was in compliance with local laws, regulations, corporate governance directives and code of ethics, although Plaintiffs did not discuss this allegation in their papers. SAC ¶ 56.

i.   *The Timing of PetroChina's Alleged Misrepresentations*

The SAC's primary defect is that it relies on allegations of bribery and corruption that postdate the time period covered by the 2011 and 2012 annual reports. Most of the SAC's allegations involving PetroChina officials took place in 2014, months after the public statements at issue were made and after the class period ended. *See id.* ¶¶ 36-39, 42-44. Plaintiffs fail to establish that *any* statement in the 2011 annual report, including Jiang's SOX certification, was

falsely made because they do not allege a single fact that *precedes* the filing of the report on April 26, 2012.  Because the SAC does not allege that either Jiang or anyone else at the Company were engaged in fraudulent acts at the time the 2011 annual report was filed,  Plaintiffs have not established that:  (1) Jiang falsely stated that he disclosed any fraud involving PetroChina or its employees; (2) Jiang falsely stated that he disclosed all internal control deficiencies; and (3) the 2011 report contained false statements concerning the adequacy of PetroChina's internal controls and the Company's compliance with laws, regulations, corporate governance directives and code of ethics.

Furthermore, the only vague allegation of fraud that predates the filing of the 2012 annual report is the claim that, on March 18, 2013, Jiang resigned from PetroChina and was "promoted" to Director of SASAC.  *Id.* ¶ 22.  However, the SAC does not suggest that, from PetroChina's perspective, it was clear that his departure indicated that he was engaged in fraud of any sort. Nor is it necessarily implied by the fact that the Chinese media reported that he was removed from his post at PetroChina to prevent him from interfering with the PRC's investigation.[16]  *See id.*  The SAC also fails to demonstrate that PetroChina officials were aware of any bribery that Jiang—who had departed a month earlier—might have been involved in when the Company filed its 2012 annual report on April 26, 2013.  *See id.* ¶ 55.

Plaintiffs' strongest claim is that, one day after PetroChina filed its 2012 report, it announced that the PRC was investigating three of its officials, including Li and Ran, and that all three were resigning.  *Id.* ¶ 27.  In fact, the actual text of the announcement states that CNPC

---

[16] The SAC does allege that the Communist Party subsequently confirmed that Jiang had been expelled on October 23, 2013 and that he was charged with criminal bribery on July 14, 2014.  SAC ¶¶ 39-40.  However, neither of these allegations establish that he was engaged in bribery either at the time he signed the SOX certification on April 26, 2012 or that PetroChina was aware of his conduct when it filed its 2012 annual report.  *See id.* ¶ 47.

informed PetroChina of the investigation on April 26, 2013—the same day the Company filed its annual report.  *See* Paskowitz Reply Decl., Doc.  51, Ex. 5 at 4.  However, nowhere does it indicate that Li and Ran were being investigated for "severe breaches of discipline" or corruption, as the SAC alleges.  *See* SAC ¶ 27.  Rather, the announcement states that three officials were resigning for "personal reasons" and that Ran confirmed that "there is no other matter that should be brought to the attention of the shareholders of the Company."  *See* Paskowitz Reply Decl., Doc.  51, Ex. 5 at 4.  Given that this is the sole allegation against Ran and Li in connection with PetroChina, Plaintiffs have not established how the vague announcement rendered false any portion of the 2012 annual report discussing internal controls, corporate governance, or disclosure of fraud.  Moreover, the statements contained in the report reflect the Company's activities *as of* December 31, 2012 and Plaintiffs have not alleged any facts that occurred prior to March 2013.[17]  *See* Paskowitz Decl., Doc. 44, Ex. A at 2; *see also Nadoff v. Duane Reade, Inc*., 107 F. App'x 250, 252 (2d Cir. 2004) ("Accurate statements about past performance are self[-]evidently not actionable under the securities laws[.]").  Accordingly, it has not demonstrated that the underlying fraud took place during the relevant time period.[18]  *See Shemian v. Research In Motion Ltd*., No. 11 Civ. 4068 (RJS), 2013 WL 1285779, at *21 (S.D.N.Y. Mar. 29, 2013) *aff'd*, 570 F. App'x 32 (2d Cir. 2014) (plaintiff did not establish a material omission where he "failed to allege sufficient facts regarding the existence and timing of Defendants' knowledge of defects to give rise to a duty to disclose").

---

[17] The SOX certification attached to the 2012 annual report, signed by Jiping, affirms that he and the Company's other certifying officer disclosed any fraud involving management or other employees "based on our most recent evaluation of internal control over financial reporting."  Paskowitz Decl., Doc. 44, Ex. A at 13.

[18] Although the SAC also points to statements made on PetroChina's website, it does not identify when these statements were made.  Rather, it states that PetroChina's website was "referenced and incorporated in the 20-F."  SAC ¶ 52.

Plaintiffs counter that "[n]o court has ever held that the only way to plead that bribes took place is to plead the specifics of the transactions."  Doc. 47 at 10.  However, this Court is not requiring that Plaintiffs allege a detailed account of the particular illicit deals that PetroChina officials were allegedly engaged in.  Plaintiffs *are* required, nonetheless, to establish—at a bare minimum—that the underlying fraud took place during the time period covered by the purportedly false public statements and that someone at PetroChina knew or had reason to know about it.  In support of their argument, Plaintiffs cite a District of Utah case, which they interpreted as having found that an auditor's statement that the defendant was aware of bribery sufficed to establish that the bribery took place.  *See id*. at 10 (citing *In re Nature's Sunshine Products Sec. Litig*., 486 F. Supp. 2d 1301, 1307 (D. Utah 2007)).  However, the Utah court's holding was narrower than Plaintiffs suggest.  The court observed that the plaintiffs alleged that the company's CEO made a payment in violation of the Foreign Corrupt Practice Act and that the company's auditor made written statements that its special committee viewed "certain electronic communications" to reach the conclusion that the CEO knew of the fraud.  *Id*.  Most significantly, the plaintiffs asserted that the CEO knew of the material fraud *before* any of the false statements were made.  *Id*. at 1308.

ii.     *PetroChina's Statements About Its Internal Controls*

Although Plaintiffs' failure to establish that the underlying fraud occurred during the applicable timeframe is in itself dispositive, the SAC is insufficiently plead for numerous other reasons.  For example, Plaintiffs have not demonstrated that PetroChina falsely stated that its internal controls were adequate.  In *In re Gentiva Sec. Litig*., 932 F. Supp. 2d 352, 370 (E.D.N.Y. 2013), which PetroChina cites, the plaintiff similarly alleged that the defendants' SOX certifications were misleading because the company's "disclosure controls and procedures and

19

internal controls over financial reporting were not 'effective.'"  However, the court found that

the plaintiff did not "allege any particularized facts which would suggest that the actions

articulated in the SOX Certifications were not undertaken by the individual defendants or for that

matter any factual allegations concerning [the company's] financial reporting processes."  *Id*.  It

further noted that the plaintiff did not allege "any facts pertaining to the Company's internal

structure for financial controls," nor challenged the defendants' accounting.  *Id*. (quoting *City of

Monroe Employees' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc*., No. 10 Civ. 2835 (NRB), 2011

WL 4357368, at *22 (S.D.N.Y. Sept. 19, 2011) (finding that the plaintiffs' allegation of lack of

internal controls was conclusory)) (internal quotation marks omitted).

      This Court finds the reasoning in *Gentiva* to be persuasive.[19]  Here, the 2011 annual

report states that the Company undertook an evaluation of its internal controls for financial

reporting and concluded that they were "effective" as of December 31, 2011.[20]  SAC ¶ 47.  It

also indicates that the effectiveness of the Company's internal control over financial reporting

was audited by PricewaterhouseCoopers.  *Id*.  In his SOX certification, Jiang affirmed that he

evaluated the Company's internal controls and that he and the other certifying officer—

presumably Li—disclosed "all significant deficiencies and material weaknesses" of PetroChina's

internal control over financial reporting "which are reasonably likely to adversely affect the

registrant's ability to record, process, summarize and report financial information" to its auditors.

---

[19] Plaintiffs attempt to distinguish *Gentiva* by noting that, unlike the case at hand, the individual defendants did not directly participate in the misconduct.  *See* Doc. 47 at 16.  However, the *Gentiva* court's determination that the company's SOX certifications were not misleading did not rest on whether or not the individual defendants had any involvement in the alleged underlying fraud; rather, the court was focused on whether the plaintiff had sufficiently alleged that the actions articulated in the SOX Certifications were not undertaken.  *See Gentiva*, 932 F. Supp. 2d at 370.

[20] The Company made identical representations concerning its internal controls in its 2012 annual report.  *See* Paskowitz Decl., Doc. 44, Ex. A at 3.

*Id.* at ¶ 54.  He also attested that he and the other certifying officer disclosed any fraud to

PetroChina's auditors involving management or other employees "with a significant role in the

registrant's internal control over financial reporting."  *Id.*  The SAC does not claim that

PetroChina failed to evaluate its internal controls or disclose any weaknesses to its auditors.  It

does not assert that the certifying officers neglected to inform PetroChina's auditor of any

relevant fraud.  And it does not establish that PetroChina's internal controls in relation to

*financial reporting* were insufficient; much less does the SAC make any allegation as to how or

why PetroChina's internal controls were inadequate.[21]  *See Janbay v. Canadian Solar, Inc.*, No.

10 Civ. 4430 (RWS), 2012 WL 1080306, at *9 (S.D.N.Y. Mar. 30, 2012) (finding that the

plaintiffs' allegations concerning internal and disclosure controls were insufficient because they

"failed to allege specific facts concerning the purportedly deficient internal controls, including

how they were deficient, when and why").  Even if PetroChina officials were engaging in

bribery, the SAC does not make any allegations that would imply that the Company had flawed

---

[21] As one Court has noted, there is "some debate within this Circuit as to whether statements that put the sources of stated revenue at issue without revealing their actual improper source can render the reports of revenue themselves actionably misleading."  *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 356 (S.D.N.Y. 2008) (citing *In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 470 (S.D.N.Y. 2006)).  However, this Court need not decide the issue because Plaintiffs do not allege that any of PetroChina's statements put the source of its revenue at issue, nor do they allege that PetroChina's revenue was materially affected by the alleged corruption.  *See id.*

internal controls over *financial reporting*.[22]  Therefore, Plaintiffs have not established that the

Company's statements concerning its internal control over financial reporting were false.[23]

iii.    *PetroChina's Statements About Its Compliance Practices*

Plaintiffs have also failed to establish that PetroChina's statements about its compliance

practices were false or misleading.  The statements contained in PetroChina's annual reports

simply confirm that the Company has codes of ethics in place and that its "corporate governance

framework is subject to the mandatory provisions of the PRC Company Law and the Corporate

Governance Rules as well as the securities laws, regulations and the listing rules of Hong Kong

and the United States."  SAC ¶ 50.  In its annual reports, PetroChina does not claim to be in

compliance with any of the corporate governance rules and regulations that it concedes to be

subject to.  Quite the contrary, it discloses that "[o]ur CEO is not required under the PRC

Company Law and the HKSE Listing Rules to submit, and our CEO does not currently submit" a

---

[22] Plaintiffs cite *S.E.C. v. Jackson*, 908 F. Supp. 2d 834, 840, 864 (S.D. Tex. 2012) for the proposition that "[b]ribes such as those Jiang received and PetroChina paid are internal control violations which must be disclosed to auditors pursuant to SOX certifications."  *See* Doc. 47 at 13.  Besides the fact that *Jackson* was decided by a court outside of the Second Circuit, it was not a securities fraud case brought under §10(b).  Rather, it dealt with a motion to dismiss an SEC civil enforcement action primarily alleging violations of the Foreign Corrupt Practices Act, along with other sections of the Exchange Act.  *See Jackson*, 908 F. Supp. 2d at 839-40.  Furthermore, the passages that Plaintiffs reference do not support their argument.  One of Plaintiffs' citations merely points to the court's recitation of the SEC's claims; the other notes that the SEC alleged "sufficient facts . . . to support the inference that [the company's] books were, in fact, false because they recorded illegal bribes as legitimate expenses."  *Id.* at 840, 864.  Here, Plaintiffs never made any allegations regarding PetroChina's accounting.

Furthermore, the second case that Plaintiffs rely on involved a complaint that contained specific claims about the company's internal controls, including "continued reliance on a known to be seriously deficient ERP [enterprise resource planning] system, embezzlement by the Comptroller (which was not disclosed to the public), and allegations of well over a dozen confidential witnesses as to various matters from understaffing to inadequate reporting systems."  *See In re Faro Technologies Sec. Litig.*, 534 F. Supp. 2d 1248, 1263 (M.D. Fla. 2007).

[23] PetroChina also argues that "Plaintiffs fail to allege that the single act of bribery affected PetroChina's financial statements or internal controls, *which is the only issue addressed by the [SOX] Certification*."  Doc. 43 at 16 (emphasis added).  However, PetroChina relies on *FBR*, 544 F. Supp. 2d at 363, in which the court *declined* to reach the issue of whether the "any fraud" portion of the SOX certification only refers to frauds directly related to the preparation of financial statements.

certification that he "is not aware of any violation by the company of NYSE corporate

governance listing standards." *Id.* Although the Company's codes of ethics prohibit bribery and

other forms of fraudulent conduct, they do not claim that PetroChina's officers are abiding by

them. Since the SAC does not challenge the actual existence of these rules, nor PetroChina's

description of them, Plaintiffs have not demonstrated that the Company's statements were false

or misleading. *See In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 359 (S.D.N.Y. 2008) (finding

that the complaint failed to claim securities fraud where it did not allege "that the risk

management program did not exist, or that it did not have the abovementioned aims").

 Although PetroChina's website affirmatively represented that the Company was in

compliance with certain requirements, Plaintiffs have also failed to establish that it contained a

material misrepresentation or omission. PetroChina's website broadly stated that the Company

"has always and conscientiously complied with the requirements of the China Securities

Regulatory Commission, The [sic] Stock Exchange of Hong Kong Limited . . . The [sic] New

York Stock Exchange, Inc. and the United States Securities and Exchange Commission as well

as other regulatory requirements[.]" *Id.* ¶ 52. It also indicated that that PetroChina "has been

regulating its internal management and operations in a strict manner in accordance with its

Articles of Association, Work Manual of the Board of Directors, Organisation and Rules of

Procedure of the Supervisory Committee, as well as the Principles for Control and Procedures of

Disclosure by the Company." *Id.* Yet, Plaintiffs have not identified a specific requirement of the

China Securities Regulatory Commission, HKSE, NYSE, or SEC that PetroChina was violating

at the time of its statements. Nor have Plaintiffs pointed to any portion of the internal documents

specifically mentioned by the Company that PetroChina was breaching. In fact, the only internal

documents that the SAC points to are PetroChina's codes of ethics. *See* SAC ¶ 51. Notably, the

above-referenced excerpt from PetroChina's website is silent as to the Company's codes of ethics, which Plaintiffs quote extensively. *See id.* ¶ 52. Simply put, while the SAC certainly suggests that the PRC suspected that PetroChina officials were engaged in some type of wrongful conduct, Plaintiffs never specify when that conduct occurred or how it rendered PetroChina's public statements false. Since Plaintiffs have not established that any of PetroChina's statements about its corporate governance compliance practices were false, their §10(b) claim against the Company must be dismissed.

## B. Section 10(b): Scienter

### i.   *Corporate Scienter*

Plaintiffs proceed under the theory that, if the SAC establishes scienter on behalf of the Individual Defendants, their state of mind can be imputed to PetroChina. *See* Doc. 47 at 17. The SAC states that "[t]he scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to PetroChina under *respondeat superior* and agency principles." SAC ¶ 18.

"When the defendant is a corporate entity . . . the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). The "most straightforward way to raise such an inference for a corporate defendant" in most cases is "to plead it for an individual defendant." *Id.* In sum, "[a] plaintiff can raise an inference of corporate scienter by establishing scienter on behalf of an employee who acted within the scope of his employment." *Vining v. Oppenheimer Holdings Inc.*, No. 08 Civ. 4435 (LAP), 2010 WL 3825722, at *12 (S.D.N.Y. Sept. 29, 2010) (internal citation omitted).

24

PetroChina invokes the adverse interest doctrine, maintaining that the knowledge of the Individual Defendants cannot be imputed to the Company because their actions were adverse to PetroChina and solely for their own self-interest.  Doc. 43 at 13.  However, "the adverse interest exception to such imputation is narrow[.]"  *Stream SICAV v. Wang*, 989 F. Supp. 2d 264, 277 (S.D.N.Y. 2013).  In *Wang*, the court rejected the adverse interest exception and held that the individual defendant's scienter could be imputed to the holding company for which he served as CEO.[24]  *Id.*  The decision referred to New York agency law to define the adverse interest doctrine:[25]

> The crucial distinction is between conduct that defrauds the corporation and conduct that defrauds others for the corporation's benefit . . . [W]hen insiders defraud third parties *for* the corporation, the adverse interest exception is not pertinent . . . *So long as the corporate wrongdoer's fraudulent conduct enables the business to survive—to attract investors and customers and raise funds for corporate purposes—this test is not met.*

*Wang*, 989 F. Supp. 2d at 277 (S.D.N.Y. 2013) (quoting *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 468, 938 N.E.2d 941, 952 (2010)) (emphases added) (alteration in original).  The *Wang* court pointed out that the CEO's failure to correct his and the holding company's public statements "did not operate as fraud on the corporation;" rather, his concealment of a material fact allowed the company "to survive—to attract investors and customers and raise funds for

---

[24] The CEO in *Wang* caused 380,000 shares to be secretly sold, even though the company had previously announced that its senior management had entered into a lock-up agreement that prevented them from selling any shares until 2012.  *Wang*, 989 F. Supp. 2d at 269.  The shares were sold pursuant to an amended and restated lock-up agreement, which terminated the previous agreement and was not disclosed to shareholders.  *Id.*  The complaint alleged that the holding company and its CEO falsely represented that certain shares were locked up, which inflated the stock price.  *Id.* at 271.

[25] In their opposition papers, Plaintiffs claim that it is "unclear" whether United States or Chinese law determines whether the Individual Defendants' scienter can be imputed to PetroChina.  *See* Doc. 47 at 18 n.13.  However, they do not offer any basis for why Chinese law might be applicable.

corporate purposes." *Id.* (quoting *Kirschner*, 15 N.Y.3d at 468, 938 N.E.2d 941) (internal

quotation marks omitted).  In *Kirschner*, the New York Court of Appeals case quoted by *Wang*,

the court stated that "for the adverse interest exception to apply, the agent 'must have *totally*

*abandoned* his principal's interests and be acting *entirely* for his own or another's purposes,' not

the corporation's."  *Kirschner*, 15 N.Y.3d at 468, 938 N.E.2d at 953 (emphases added).  It went

on to note that "[t]he disclosure of corporate fraud nearly always injures the corporation."  *Id.* at

469, 953.  Otherwise, "a corporation would be able to invoke the adverse interest exception and

disclaim virtually every corporate fraud—even a fraud undertaken for the corporation's

benefit—as soon as it was discovered and no longer helping the company."  *Id.*

On the facts presented here, the adverse interest exception does not apply.  Presumably, it

was in PetroChina's interest for any corruption occurring within the Company to remain

undisclosed in order to preserve its shareholders' confidence.  In contrast, all of the cases that

PetroChina cites in support of the application of the adverse interest doctrine involved corporate

actors that were deemed to have acted to the company's detriment.  For example, in *In re*

*ChinaCast Educ. Corp. Sec. Litig.*, No. 12 Civ. 4621 (JFW) (PLAX), 2012 WL 6136746, at *2

(C.D. Cal. Dec. 7, 2012), the CEO allegedly "looted corporate assets."  In concluding that the

plaintiffs failed to allege scienter against the corporation, the court in *ChinaCast* quoted an Ohio

district court case which stated, "[c]ourts have typically found that an agent who uses his office

to loot corporate assets has acted adversely to his principal."  *Id.* at *10 (quoting *In re Nat'l*

*Century Fin. Enterprises, Inc.*, 783 F. Supp. 2d 1003, 1016 (S.D. Ohio 2011)).  Similarly, in *In*

*re JPMorgan Chase & Co. Sec. Litig.*, No. 06 Civ. 4675, 2007 WL 4531794, at *9 (N.D. Ill.

Dec. 18, 2007), another case that PetroChina cites, the court explicitly determined that the

plaintiffs' allegations suggested that the CEO and Chairman of the Board of Directors "enriched

himself at the expense of the corporate entity" by agreeing to remain as CEO for two years in exchange for a fourteen percent premium against the corporation in its merger with another entity.  The instant action presents no such scenario.[26]

Furthermore, the Court notes that the pertinent acts here are the Individual Defendants' public statements on behalf of PetroChina, *not* the alleged underlying fraud.  Thus, to the extent that the SAC is able to establish that the Individual Defendants possessed the requisite scienter, it can be imputed PetroChina.

*ii.*   *Pleading Requirements for Scienter*

"[W]hile § 10(b) has been described and may have been contemplated as a 'catchall' provision, 'what it catches must be fraud.'"   *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 413 (S.D.N.Y. 2001) (quoting *Chiarella v. U.S.*, 445 U.S. 222, 234–35 (1980)). Section 10(b) and Rule 10b-5 require plaintiffs to allege a state of mind demonstrating "an intent to deceive, manipulate or defraud," also known as scienter.  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)); *see also, e.g.*, *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 469 (S.D.N.Y. 2004).  To satisfy the PSLRA's pleading requirements for scienter, a plaintiff must allege facts with particularity that would give rise "to a strong inference that the defendant acted with the required state of mind."   *ECA*, 553 F.3d at 198 (quoting 15 U.S.C. § 78u-4(b)(2)(A)) (internal quotation marks omitted).   As Supreme Court precedent dictates, a "strong inference" that a

---

[26] PetroChina also claims that Plaintiffs have not satisfied the corporate scienter standard the Second Circuit adopted in *Dynex*.  However, *Dynex* merely addresses the level of specificity necessary to raise the required inference of scienter "with regard to a corporate defendant *without doing so with regard to a specific individual defendant*." *Dynex.*, 531 F.3d at 195 (emphasis added).  The issue here is whether the state of mind of the Individual Defendants can be imputed to PetroChina.

defendant acted with a certain intent is one that is "more than merely plausible or reasonable—it must be cogent and *at least as compelling as* any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314 (emphasis added). This inquiry goes beyond the ordinary Rule 9(b) framework and requires courts to consider "not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Id.* "The relevant inquiry for the Court 'is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any *individual* allegation, scrutinized in isolation, meets that standard.'" *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F.Supp.3d 278, 291-92 (S.D.N.Y. June 23, 2014) (emphasis in original) (citing *Tellabs*, 551 U.S. at 322-23).

A plaintiff may establish scienter by alleging facts that either (1) show that the defendant had both the "motive and opportunity" to commit the alleged fraud, or (2) "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006) (citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).

### iii.   Motive and Opportunity

"A complaint has sufficiently alleged 'motive and opportunity to commit fraud' if it pleads facts showing that the defendant 'benefited in some concrete and personal way from the purported fraud.'" *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 468 (S.D.N.Y. 2013) (quoting *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000)). For the purpose of establishing scienter, general motives that are common to most corporate officers do not constitute "motive." *ECA*, 553 F.3d at 198. Therefore, the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation do not suffice to establish a motive. *Id.* (citing *Novak*, 216 F.3d at 307). "The opportunity to commit fraud is generally

assumed where the defendant is a corporation or corporate officer." *Van Dongen*, 951 F. Supp. 2d at 468 (listing cases).

The parties do not appear to dispute that the Individual Defendants, by virtue of their positions at PetroChina, had the opportunity to commit fraud; rather they disagree as to whether Plaintiffs have sufficiently alleged a motive. Plaintiffs maintain that the SAC alleges that all three Individual Defendants received bribes and that, had they told PetroChina's auditor about the bribes or reported that they had violated the Company's code of ethics, they would not be able to continue receiving bribes.[27] Doc. 47 at 17. However, of the three Individual Defendants, the SAC only specifically alleges that Jiang was receiving bribes. More significantly, the SAC fails to allege that *any* of the Individual Defendants were engaged in corruption of any kind at the time or prior to *when the false statements were made* and therefore possessed a motive to commit securities fraud.

First, the SAC only singles out Jiang as having accepted bribes among the three Individual Defendants. *See* SAC ¶¶ 39-40. In fact, Jiang is the sole PetroChina officer or employee that the SAC specifically associates with bribery. Although the SAC accuses many other individuals of accepting bribes, none of them—including the country's "former security czar," the chairman of PetroChina's supplier, an ousted PRC Politburo member, the PRC's Vice Minister of Public Security, and China National Petroleum Corporation's Vice President—are alleged to have been employees of PetroChina. *Id.* ¶¶ 20, 30, 32, 35, 41. As to Ran and Li, the

---

[27] Plaintiffs also claim that, since the Complaint was filed, Jiang admitted that he received at least $2.3 million in bribes. Doc. 47 at 17. However, this fact is not contained in the SAC and the Court specifically denied Plaintiffs leave to amend their complaint for a third time. *See* Hr'g Tr., April 10, 2014 at 11:20-21. Therefore, the Court will not consider this claim. *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("In considering a motion under Fed. R. Civ. P. 12(b)(6) to dismiss a complaint for failure to state a claim on which relief can be granted, the district court is normally required to look only to the allegations on the face of the complaint.").

SAC merely alleges that, on August 27, 2013, the Company announced that the SASAC launched an investigation into the two of them, who resigned effective immediately.[28]  *Id.* ¶ 27; *see also* Paskowitz Reply Decl., Ex. 5, Doc. 51 at 4.  Even if the Court accepts Plaintiffs' allegation that Li and Ran were being investigated for corruption—which, contrary to the SAC, is not contained in PetroChina's announcement—the SAC does not allege what Ran and Li's "corrupt" activities consisted of.  *See* SAC ¶ 27.  Nor does it indicate that their conduct was in any way connected to their official duties on behalf of PetroChina.  In the absence of facts describing the "corruption" that Ran and Li were being investigated for, the Court is unable to infer how or why they would have been personally motivated to make false or misleading statements on behalf of PetroChina.

Second, since the SAC does not specify when the alleged bribery or corruption took place, it is not clear that it had either occurred or was ongoing during the time period covered by the 2011 and 2012 annual reports.[29]  *See supra* Part IV.A.i.  The SAC does not allege any facts to establish that Jiang was accepting bribes when the 2011 annual report was filed and he was no longer a employee by the time the Company filed its 2012 annual report.[30]  *See* SAC ¶ 22.  The

---

[28] The SAC also notes that Shaanxi Provincial Chinese People's Political Consultive Conference revoked Ran's membership on June 20, 2014, six months after the class period ended.  SAC ¶ 38.

[29] In their opposition papers, Plaintiffs cite *In re Immucor Inc. Sec. Litig.*, No. 05 Civ. 2276 (WSD), 2006 WL 3000133, at *18 (N.D. Ga. Oct. 4, 2006) to support their argument that the fact that the SAC claims that Jiang was accepting bribes shows that he knew bribes were being paid and therefore had a motive to conceal them.  *See* Doc. 47 at 12.  However, in *Immucor*, the plaintiffs alleged that the company president was personally involved with a series of bribes, contract manipulations and other improper business practices starting in 1998, which clearly implied that he knew that the statements to which he attested in 2004 and 2005 were false or misleading.  *See Immucor*, 2006 WL 3000133, at *2, 18.

[30] As to the section on PetroChina's website detailing the Company's compliance with multiple regulatory and internal requirements, the SAC does not indicate when those statements were made or who within PetroChina was responsible for making them.  The SAC quotes a portion of the 2011 annual report which indicates that PetroChina adopted its senior management code of ethics on March 23, 2004 and its code of ethics for employees on March 2, 2005.  SAC ¶ 50.

SAC does not point to any false statements made by Ran at any point in time.  Although Li signed both the 2011 and 2012 annual reports, it is not clear that he was engaged in any corrupt acts during the fiscal years that he reported on.  Notably, the SAC fails to mention that the 2012 annual report contained a SOX certification signed by Jiping, identified as "performing the functions of Chief Executive Officer"—as opposed to Jiang, who signed the 2011 report.  *See id*. at 13.  The SAC also does not allege that Jiping was engaged in corruption or had any other personal motivation to commit securities fraud.

Because it is not evident from the facts alleged that the Individual Defendants were engaged in corruption that they would benefit from concealing during the timeframe encompassed by the annual reports, the Court cannot determine that they "benefited in some concrete and personal way from the purported fraud."  *See Van Dongen*, 951 F. Supp. 2d at 468 (quoting *Novak*, 216 F.3d at 307-08).  Therefore, Plaintiffs have not made a sufficient showing that the Individual Defendants had a motive to commit fraud.

iv.   *Circumstantial Evidence*

An inference of scienter may arise where a complaint sufficiently alleges that the defendants "engaged in deliberately illegal behavior . . . knew facts or had access to information suggesting that their public statements were not accurate . . . or . . . failed to check information they had a duty to monitor."  *Novak*, 216 F.3d at 311.  When a plaintiff fails to allege a motive to commit fraud, the plaintiff's allegations that indicate a defendant's recklessness "must be correspondingly greater."  *Kalnit*, 264 F.3d at 142 (internal citations omitted).  In order to establish scienter under the conscious misbehavior theory, Plaintiffs "must show conduct by defendants that is at the least highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the

defendant or so obvious that the defendant must have been aware of it." *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 216 (S.D.N.Y. 2004) (quoting *Kalnit*, 264 F.3d at 142) (internal quotation marks omitted).

Alternatively, "[t[o state a claim based on recklessness, plaintiffs may either specifically allege defendants' knowledge of facts or access to information contradicting defendants' public statements, or allege that defendants failed to check information that they had a duty to monitor." *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 574 (S.D.N.Y. 2012) ("*Longtop I*") (quoting *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 272 (S.D.N.Y. 2009)) (internal quotation marks omitted).  To the extent that plaintiffs assert that defendants had access to contrary facts, the complaint must "specifically identify the reports or statements containing this information." *Id.* at 574-75 (citing *Dynex*, 531 F.3d at 196 (quoting *Novak*, 216 F.3d at 309)).  Nonetheless, it is well-settled that "fraud by hindsight" is not a cognizable theory of relief; "fraud is always obvious in retrospect, but it is not reckless to lack clairvoyance." *Longtop I*, 910 F. Supp. 2d at 579.

The SAC claims that the Individual Defendants had actual knowledge of the materially false and misleading statements by virtue of their positions at PetroChina.  SAC ¶ 70.  However, in order to establish an inference of scienter, Plaintiffs must do more than allege that the Individual Defendants had or should have had knowledge of certain facts contrary to their public statements simply by virtue of their high-level positions.  *See Johnson v. Siemens AG*, No. 09 Civ. 5310 (JG) (RER), 2011 WL 1304267, at *15 (E.D.N.Y. Mar. 31, 2011) (finding that the lead plaintiff could not allege that the defendants engaged in deliberately illegal behavior simply by virtue of their high-level positions, general responsibilities, and their access to inside information) (internal citations omitted); *see also In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423

F. Supp. 2d 364, 406 (S.D.N.Y. 2006) (holding that generalized allegations that the individual defendants "knew, or should have known, that they were misrepresenting material facts, based on their senior positions in the company" are insufficient to establish scienter).  "[I]t is well established that 'accusations founded on nothing more than a defendant's corporate position are entitled to no weight.'"  *Shemian*, 2013 WL 1285779, at *17 (quoting *Bd. of Trustees of City of Ft. Lauderdale Gen. Employees' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 873 (S.D.N.Y. 2011) *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012)).

In their papers, Plaintiffs once again rely on their argument that, because the SAC alleges that the Individual Defendants accepted bribes, it has established conscious misbehavior because they were obviously aware of their own bribery.  However, as noted above, besides Jiang, the SAC does not allege that the other Individual Defendants accepted bribes, nor does it specify when Jiang received bribes.  *See supra* Part IV.B.iii.  Plaintiffs' papers also maintain that Jiang "clearly knew" of the bribery because "he took direction from Yongkang, who had so many allies in PetroChina."  Doc. 47 at 17.  However, the connection that the SAC draws between Yongkang, PetroChina, and Jiang is tenuous, at best.  The SAC simply states that Jiang was Yongkang's protégé and that, "Jiang enjoyed a meteoric rise at CNPC," "[u]nder Yonkang's tutelage."  SAC ¶ 20-21.  Never does the SAC allege that Jiang "took direction" from Yongkang, as Plaintiffs' papers indicate.  Moreover, the SAC only obliquely describes Yongkang's own alleged wrongdoing.  The SAC maintains that the PRC seized over $14.5 billion in assets from Yongkang in connection with its corruption investigation—however, it does not indicate when this event occurred, nor does it specify when Yongkang undertook any acts of corruption, what they consisted of, or whether they had any connection to PetroChina whatsoever.  SAC ¶ 20.

Instead, it merely states that Yongkang has been under house arrest by the Chinese government since 2013.  *Id.*

The SAC does list several Yongkang's "allies" that were associated with bribery or corruption.[31]  *Id.* ¶¶ 32, 35, 44.  However, only Lixin, the Chairman of Supervising Committee of PetroChina, was employed by the Company.  *Id.* ¶ 44.  The SAC describes Lixin as "a Yongkang confidant" who was detained by PRC officials "in connection with corruption at PetroChina" on October 10, 2014—over a year after the Individual Defendants left the Company and long after the relevant public statements were made.  *Id.* ¶¶ 22, 27, 44.  Plaintiffs fail to allege facts that establish that the Individual Defendants—even Jiang—were aware that Lixin or any other PetroChina officials were engaged in corruption.

In short, Plaintiffs' allegations do not demonstrate that the Individual Defendants knew of and either consciously or recklessly disregarded the alleged corruption at PetroChina *at the time the purported false statements were made*.  Therefore, Plaintiffs' §10(b) claim must fail because the SAC does not raise a "strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."  *See Dynex*, 531 F.3d at 195.

## C.  Section 10(b): Loss Causation

Plaintiffs' failure to adequately plead either scienter or a misstatement or omission is dispositive.  Thus, the Court need not reach the issue of loss causation.  *See In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *22 (S.D.N.Y. Sept. 28, 2012) *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) ("Because the issue of scienter . . . proves fatal to Plaintiffs' Section 10(b) . . . the Court need not

---

[31] The SAC also states that Yongkang's sister-in-law, who served as PetroChina's Chief Business Representative in Canada, "has been missing."  SAC ¶ 43.  However, it does not allege that she was engaged in any corrupt actions.

reach the UBS Defendants' arguments regarding . . . loss causation[.]"); *Hutchinson v. Perez*, No. 12 Civ. 1073 (HB), 2012 WL 5451258, at *8 (S.D.N.Y. Nov. 8, 2012) *amended*, No. 12 Civ. 1073 (HB), 2013 WL 93171 (S.D.N.Y. Jan. 8, 2013) ("Since the Court must dismiss the Amended Complaint if Plaintiff fails to adequately plead scienter, I need not reach loss causation or misleading statements and omissions under the PSLRA."); *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, No. 09 Civ.4050 (PKC), 2010 WL 3790810, at *22 (S.D.N.Y. Sept. 28, 2010) ("I need not reach the issue of whether the SAC alleges loss causation because the SAC fails to allege a misstatement or that defendants acted with scienter.").

The Court notes, however, that PetroChina's so-called corrective disclosures did not disclose the information that the SAC describes. "Loss causation is typically shown by the reaction of the market to a corrective disclosure which reveals a prior misleading statement, but may also be shown by the materialization of risk method, whereby a concealed risk . . . comes to light in a series of revealing events that negatively affect stock price over time.'" *Solow v. Citigroup, Inc.*, 827 F. Supp. 2d 280, 292 (S.D.N.Y. 2011) (quoting *In re Vivendi Universal, S.A., Sec. Litig.*, 765 F. Supp. 2d 512, 555 (S.D.N.Y. 2011) (internal quotation marks omitted)); *see also Leykin v. AT & T Corp.*, 423 F. Supp. 2d 229, 240 (S.D.N.Y. 2006), *aff'd*, 216 F. App'x 14 (2d Cir. 2007), *cert. denied*, 552 U.S. 1097 (2008) ("A concealed risk can lead to a decline in stock price either because a corrective disclosure reveals the falsity of the misrepresentations or omissions, or because the risk which was concealed materializes and causes the price decline.").

Here, Plaintiffs point to two corrective disclosures they claim revealed PetroChina's prior misleading statements. *See* Doc. 47 at 22. As to the first, Plaintiffs maintain that PetroChina announced on August 27, 2013 that three PetroChina officers were being investigated for "severe breaches of discipline." *See id.*; *see also* SAC ¶ 27. However, the actual text of the announcement,

which PetroChina attached to its moving papers and the SAC incorporates by reference, simply states that the PRC was investigating three PetroChina officers who were resigning for "personal reasons." Paskowitz Decl., Doc. 44, Ex. C at 4. Even if Plaintiffs had properly alleged that PetroChina's public statements deceptively concealed any corruption that may have been taking place at the Company, it is unlikely that the vague August 27, 2013 announcement called into question the Company's prior representations. It neither stated what the three PetroChina officials were being investigated for, nor which arm of the PRC was conducting the investigation. In their opposition papers, Plaintiffs claim the second corrective disclosure occurred on December 17, 2013, when PetroChina announced that it had fired two of its senior officials for corruption. Doc. 47 at 22. However, the SAC merely alleges that PetroChina's stock fell following the publication of a December 17, 2013 article by Bloomberg LP, which reported that PetroChina Supervisor Qingshan and the head of *Chinaoil* were taken into custody by PRC authorities in connection with the corruption investigation of PetroChina. SAC ¶ 33. The article itself simply states that Qingshan's resignation is "more of an embarrassment" to "PetroChina and Kunlun Energy"[32] and "unlikely to have any long-lasting negative impact on Kunlun." Kim Decl., Doc. 48, Ex. 9. It does not indicate why Qingshan resigned, let alone state that he was fired by the Company for corruption. Thus, it also does not immediately reveal the falsity of any of PetroChina's alleged misrepresentations or omissions. Regardless, since loss causation is premised on the assumption that a misstatement or omission concealed something from the market, *see Lentell v. Merrill Lynch & Co*., 396 F.3d 161, 173 (2d Cir. 2005), Plaintiffs cannot demonstrate loss causation where they have failed to establish any such misrepresentation.

---

[32] The SAC describes Kunlun Energy as "the gas distribution arm of CNPC." SAC ¶ 33.

### D.  Section 10(b): The Individual Defendants

This Court has the power to dismiss a complaint against the non-moving Individual Defendants, so long as it is exercised cautiously and on notice.  *See Wachtler v. Cnty. of Herkimer*, 35 F.3d 77, 82 (2d Cir. 1994) (internal citations omitted) (affirming the district court's dismissal of a claim against a defendant who neither filed an appearance nor moved for dismissal since plaintiff was on notice from motion of other defendants and had an opportunity to be heard); *see also Alki Partners, L.P. v. Vatas Holding GmbH*, 769 F. Supp. 2d 478, 499 (S.D.N.Y. 2011) a*ff'd sub nom. Alki Partners, L.P. v. Windhorst*, 472 F. App'x 7 (2d Cir. 2012) (dismissing §§ 10(b) and 20(a) claims against an individual defendant who did not appear in the case or join in the other defendants' motions because the plaintiffs' claims against him failed for the same reasons they failed against the other defendants).  Although the Individual Defendants have not yet been served, PetroChina's motion put Plaintiffs on notice of this ground for dismissal and Plaintiffs were afforded an opportunity to respond.   *See* Doc. 43 at 1 n.1 (acknowledging that "the arguments in this motion [to dismiss] are largely applicable to the Individual Defendants," although it was not made on their behalf).   Plaintiffs have not established scienter on behalf of the Individual Defendants, *see supra* Part IV.B; nor have they demonstrated that either Jiang or Li were aware of or participating in any corrupt acts that would render their public statements misleading.  *See supra* Part IV.A.  As to Ran, they have not even alleged that he made any public statements.  These deficiencies are fatal to Plaintiffs' §10(b) claims against PetroChina and the Individual Defendants alike.  Therefore, Plaintiff's § 10(b) claim against the Individual Defendants is dismissed.

### E.  Section 20(a)

Plaintiffs also bring claims against the Individual Defendants—Jiang, Li, and Ran—under § 20(a) of the Exchange Act, which imposes liability on individuals who control any person or

entity that violates § 10.  *See* SAC ¶¶ 77-82; *see also* 15 U.S.C. § 78t(a).  "To assert a *prima facie* case under Section 20(a), a plaintiff 'must show a primary violation by the controlled person and control of the primary violator by the targeted defendant, and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person.'" *Mechel*, 811 F. Supp. 2d at 882 (quoting *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)).  Given that a control person liability claim under § 20(a) is predicated on a primary violation of the securities laws, the control person liability claims must be dismissed because Plaintiffs have failed to allege a primary violation under § 10(b).  *See Rombach*, 355 F.3d at 178 ("Because we have already determined that the district court properly dismissed the primary securities claims against the individual defendants, these secondary claims must also be dismissed."); *see also Mechel*, 811 F. Supp. 2d at 859 n.4, 882 (dismissing §20(a) claims against individual defendants who resided in Russia and had therefore not been served with the complaint nor joined the company's motion to dismiss).

## V.    Conclusion

For the reasons set forth above, PetroChina's motion to dismiss is GRANTED.    The

Clerk of the Court is respectfully directed to terminate the motion, Doc. 42, and to close this

case.[33]


It is SO ORDERED.

Dated:    August 3, 2015
          New York, New York

_____

Edgardo Ramos, U.S.D.J.

---

[33] The PSLRA requires the Court the court to "include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion." 15 U.S.C. § 78u-4(c)(1). Neither the claims nor defenses were harassing or frivolous. All factual contentions had evidentiary support or were reasonably based on belief or a lack of information. Furthermore, PetroChina did not affirmatively allege any improper conduct or move for sanctions. In accordance with the PSLRA, the Court finds that the parties and counsel in this matter have complied with Rule 11(b).